**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 02356 |
| | ) | |
| THOMAS J. DART, et al., | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant(s). | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Thomas Clemons, a double amputee confined to a wheelchair, filed this suit alleging that defendants Cook County and the Cook County Sheriff, Thomas Dart,[1] violated both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a), when he was housed in two separate jail cells that did not comply with ADA and Rehabilitation Act structural requirements. The County is sued only on an indemnification theory and the Sheriff in his official capacity only, so this opinion refers to the defendants collectively as "the Sheriff." Clemons also brings a claim pursuant to 28 U.S.C. § 1983 contending that his cell assignment deprived him of rights secured by the Fourteenth Amendment to the Constitution of the United States. Pending is Clemons' motion for summary judgment on both the ADA and Rehabilitation Act claims, and the Sheriff's cross-motion on all counts. For reasons discussed below, Clemons' motion is granted in full; accordingly the Sheriff's cross-motion with respect to the ADA and Rehabilitation Act claims is denied. The Sheriff's motion on Clemons' 1983 claim, however, is granted.

---

[1] *See* Pl.'s Am. Compl. at ¶ 3; DSOF ¶ 2. Clemons' initially sought to impose individual liability against Sherriff Dart, but later amended to complaint to sue him in his official capacity only. *See* Pl.'s Am. Compl. at ¶ 3; DSOF ¶ 2.

Thomas Clemons was incarcerated at the Cook County Jail from September 23, 2012 to March 9, 2013. Complicating his detention, however, was the fact that Clemons has been wheelchair bound since 2003 when a gunshot wound paralyzed him from the waist down. Pl.'s Local Rule 56.1 Statement of Facts ¶ 23, ECF No. 76 ("PSOF"). In connection with these injuries, Clemons' legs were amputated in 2009. *Id.* at ¶ 26. Because of Clemons disabilities and accompanying medical requirements, he was assigned to the Cook County Sheriff Department of Corrections Cermak Hospital, division 8 ("Cermak"), which was built in 1998. *Id.* at ¶ 8.

Cermark is staffed with both correctional officers and county medical personnel twenty-four hours a day, seven days a week. Although county medical staff provide medical care to the inmates housed at Cermak, ultimately Cermak is a correctional facility that falls under the control and supervision of defendant Sheriff Thomas Dart, as he administers the Cook County Department of Corrections at large. Defs.' Local Rule 56.1 Statement of Facts ¶ 2, ECF No. 84 ("DSOF"). Cermak comprises eight tiers, each of which has thirty to forty inmates at any given time. Doctors check each tier twice daily to address medical issues as needed. *Id.* at ¶ 13. Each tier also has one registered nurse on call twenty-four hours a day, seven days a week. *Id.* The nursing staff checks on each detainee once per shift, for a total of three checks in a twenty-four hour period. During these checks, the nurse assists detainees with bathing, feeding, and administering medication. The detainees can also request assistance throughout the day via the nurse call button, which is located in each room.

---

[2] Insofar as the factual assertions provided are supported by a specific reference to the record, *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 817-818 (7th Cir. 2004), the background section is derived from both the plaintiff's and the defendant's undisputed statement of facts that were filed in accordance with local rule 56.1. Given that pending before the court are cross-motions for summary judgment, the facts are analyzed in favor of the nonmoving party as appropriate.

Although there were multiple ADA compliant cells at the Cermak facility, and notwithstanding his obvious disability, Clemons was not assigned to one. Instead, when Clemons arrived at Cermak he was processed and initially assigned to room 3115, which is an isolation room that houses a single inmate, *id.* at ¶ 46, and was then later transferred to room 3225. *Id.* at ¶ 57. Neither room complied with ADA structural requirements. Who assigned Clemons to these cells is subject to dispute between the parties. Clemons insists that correctional officers made the assignments, while the Sheriff claims that correctional officers played no role in determining Clemons' housing assignments at Cermak and that it was Cook County medical personnel that determined where Clemons would go based on his medical needs. Defs.' Resp. to Pl.'s Mot. Summ. J. 15-16, ECF No. 89; Defs.' Mot. Summ. J. 14-16, ECF No. 82. But even when analyzing the defendants' response to Clemons' motion and construing the facts in a light that is most favorable to them, the defendants' position lacks support in the record. The defendants point to the first sentence of the Cook County Health & Hospital System (CCHHS) infirmary operational statement which states that "[o]n the 3rd floor medical unit, an RN or LPN reviews the admission orders and assigns a bed." DSOF ¶ 1. But in the next sentence the policy states that "[t]he nurse ***must confer with Correctional Officers*** to incorporate both clinical and security considerations when assigning a bed." *Id.* at ¶ 11. Thus, it is apparent that even though CCHHS medical personnel had some say in where prisoners were housed, Sherriff's Department employees did too.

Both rooms 3115 and 3225 contained features that did not meet ADA and Rehabilitation Act architectural standards. PSOF ¶ 31, 40. In room 3115, Clemons' toilet seat was sixteen inches high, rather than the seventeen to nineteen inches required by the ADA. *Id.* at ¶ 32 (a). The distance from the centerline of the toilet to the side wall was twenty-four inches, rather than

the eighteen inches required by the 1991 ADA standards. *Id.* at ¶ 32 (b). The cell also lacked grab bars near the toilet, as required by the ADA. *Id.* at ¶ 32 (c). The shower compartment in the room also had a door that was only twenty-eight inches wide, rather than the minimum thirty-two inches required by the ADA, and lacked both a mounted shower seat and grab bars. *Id.* at ¶ 32 (e). Additionally, the room contained a table with fixed seating, which prevented wheelchair access. *Id.* at ¶ 32 (h). Because of these noncompliant features, Clemons contends he was unable to use the toilet to empty his colostomy bag on his own and was not regularly provided assistance to do so, which resulted in him suffering personal injury on several occasions when his colostomy bag burst or his catheter leaked. *Id.* at ¶¶ 33-35. Defendants, however, maintain that Clemons was not only provided adequate medical care, but that the care was so exceptional that it made up for the cell's structural deficiencies.

On October 2, 2012, correctional officers transferred Clemons to Room 3225, where he remained until his release on March 9, 2013. *Id.* at ¶ 39. Clemons shared this room with between five to eleven cellmates. *Id.* at ¶ 41. Room 3225 had ADA deficiencies similar to those in Room 3115. *Id.* at ¶ 40. The toilet seat was fifteen and one half inches high, rather than the required seventeen to nineteen inches high. *Id.* at ¶ 43 (a). The distance from the centerline of the toilet seat to the side wall was twenty-three inches, instead of the eighteen inches required by the applicable 1991 ADA standards. *Id.* at ¶ 43 (b). The clearance width of the toilet area perpendicular to the side wall was 55 inches, rather than the sixty inches required by law. *Id.* at ¶ 43 (c). The toilet area also lacked ADA required grab bars. *Id.* at ¶ 43 (d). The sink, which was located behind the toilet, could not be reached by a person using a wheelchair, as required by the 1991 ADA standards. *Id.* at ¶ 43 (e). Just as in Room 3115, the group shower room, which Clemons had access to while he stayed in room 3225, lacked a mounted shower seat and grab

bars. The defendants provided a portable shower chair, but it had a seat height of twenty inches, rather than a height of seventeen to nineteen inches required by the ADA. The presence of inmates in portable beds, known colloquially as "boats," compounded the problems created by the non-ADA compliant room features, as it was more difficult for wheelchair-bound inmates, such as Clemons, to move about the room. *Id.* at ¶ 44. On December 3, 2012, Clemons fell in the shower while attempting to transfer from his wheelchair to the portable shower chair. *Id.* at ¶ 51. As a result of the fall, Clemons suffered a number of personal injuries that required pain medication. *Id.* at ¶ 52.

**DISCUSSION**

To prevail on a summary judgment motion, the movant must demonstrate that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a). Summary judgment is only appropriate when the record as a whole establishes that no reasonable jury could find for the nonmoving party. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). Summary judgment is "properly entered against a party 'who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Hakim v. Accenture U.S. Pension Plan*, 718 F.3d 675, 681 (7th Cir. 2013) (citing *Parent v. Home Depot*, *U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2010) (internal quotations omitted). With these principles in mind, the parties' cross motions with respect to each claim are addressed in turn below.

**I.    Clemons' Title II ADA and Rehabilitation Act Claims**

Both Clemons and the Sheriff seek summary judgment on Clemons' ADA and Rehabilitation Act claims. Broadly stated, Title II of the ADA forbids discrimination in the provision of services, programs, and activities by public entities on the basis of an individual's

disability.[3] 42 U.S.C. § 12131. Relatedly, the Rehabilitation Act prohibits any disabled individual from being "excluded from the participation in, be[ing] denied the benefits, of, or subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. The relief available under both statutes is coextensive, thus as one claim rises or falls, so too does the other. *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671 (7th Cir. 2012) (*citing* 29 U.S.C. § 794A; 42 U.S.C. § 12117). To prevail under either theory, Clemons must establish that he (1) is a qualified individual with a disability,[4] that (2) he was denied 'the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by an entity, and that (3) the denial or discrimination was because of his disability. *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). Clemons' Rehabilitation Act claim contains the additional requirement that the entity receive federal funding.[5] 29 U.S.C. § 794A. Clemons does not seek injunctive relief (he has long since been transferred from Cook County, which renders any claim for injunctive relief moot—*see, e.g., Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004)). But to recover compensatory damages under either the ADA or the Rehabilitation Act the plaintiff must prove that the Sheriff's discrimination was intentional. *Love,* 103 F.3d at 560. Because it is undisputed that the Cook County Sheriff received federal funds during the time that Clemons was housed at the Cermak facility, PSOF

---

[3] Although contested by the defendants, it is well settled that prisons and correctional facilities are public entities within the purview of Title II. *See Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998) (Court holding that Title II of the ADA applies to correctional facilities); *Cassidy v. Indiana Dept. of Corrections*, 199 F.3d 374, 375 (7th Cir. 2000) (court noting that it is undisputed that the ADA, and by extension the Rehabilitation Act, applies to prisoners).

[4] Sheriff Dart does not dispute that Clemons is a "qualified individual" under the ADA. *Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2012) (*citing* 29 U.S.C. § 705 (9)(B) ("To be wheelchair bound is to be disabled within the Act's meaning.")).

[5] The record is clear that the Cook County Sheriff's Department received Federal financial assistance.

¶ 6, and the statutes are otherwise coextensive, this opinion will refer only to the ADA going forward.

**A. Denial of Services**

To prevail on his ADA claim, Clemons must establish that he was denied the benefits of the services, programs, or activities of a public entity. *Love*, 103 F.3d at 560; *Jaros*, 684 F.3d at 672. The ADA applies to "all services, programs, and activities provided or made available by public entities." 28 C.F.R. § 35.102 (a); *see Jaros*, 684 F.3d at 672. Clemons' contends that the Sheriff denied him the benefits of services or programs because he was housed in rooms that did not comply with ADA structural requirements. Access to showers, meals, and toilet facilities is considered a "program or activity" within the meaning of the ADA. *Jaros*, 684 F.3d at 672 (court noting that inmate access to showers and meals is a program or activity); *Phillips v. Sheriff of Cook Cnty.*, 681 F. Supp. 2d 899, 916 (N.D. Ill.2009) (same). Public entities, such as correctional facilities, must "take reasonable measures to remove architectural and other barriers" that deny access to such services. *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (citing 42 U.S.C. § 12131 (2)); *see also* 28 C.F.R. § 35. 149.

If a plaintiff was housed in a facility that satisfies statutory architectural standards, then the defendants have satisfied their obligation to provide reasonable access and cannot be said to have "denied access" to programs or services. *See* 28 C.F.R. § 35.151 (c)(1). There is no dispute, however, that the cells to which Clemons was assigned were not ADA compliant. Notwithstanding the Cermak facility's noncompliance with statutory structural requirements, however, the Sheriff asserts that Clemons was provided "equivalent access" to the facility's programs and services. Essentially, Dart maintains that access to around-the-clock nursing care, which Cermak provided, constituted "equivalent access" to ADA-compliant fixtures because it

was always available to Clemons to request assistance from the nursing staff. Def.'s Resp. to PSOF at ¶ 31; Def's Motion for SJ at 3 ("any room in that building can be made ADA accessible because there are multiple qualified medical professionals on hand in each tier, every hour of every day, to assist detainees with any and all needs, including using devices like basins and shower or toilet chairs").

Although the issue is not free from doubt, the Court agrees with Clemons' view that the availability of staff assistance upon request does not constitute equivalent access under the applicable regulations. The applicable regulation for determining whether the defendants have satisfied the "reasonable measures" requirement is 28 C.F.R. § 35.151(c)(1). That regulation states:

> If physical construction or alterations [of a facility] commence after July 26, 1992 … then new construction and alterations subject to this section must comply with either UFAS or the 1991 Standards … [d]epartures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided.

*Id.* Thus, if a facility is constructed after 1992—as was Cermak—it must comply with federal architectural standards. *Id.* But even if a facility constructed after 1992 fails to comply with those structural requirements, its shortcomings do not violate the ADA if the facility can clearly establish that equal access was provided notwithstanding its noncompliance with federal structural requirements. *Id.*

The ADA Accessibility Guidelines for Buildings and Facilities, which construe and provide technical specifications relevant to the 1991 Standards, make clear that the purpose of the equivalent facilitation provision is to allow for flexibility in ***design*** for unique and special circumstances and to facilitate the application of new disability accommodating ***technologies***,

but makes no mention of *services*. *See* 28 C.F.R. Pt. 36, App. B, ¶ 103 (defining "Equivalent Facilitation" to permit use of alternative designs and technologies that provide substantially equivalent or greater access). In identifying the scope of the equivalent access provision, the drafters of the ADA indicated that "[n]othing in these requirements prevents the use of ***designs, products, or technologies*** as alternatives to those prescribed, provided they result in substantially equivalent or greater accessibility and usability." 36 C.F.R. 1191, Appendix B—Americans with Disability Act: Scoping, ¶ 102.1 (emphasis added). Thus, while it is clear that entities are allowed to implement new ***designs*** and ***technologies*** as they become available, so long as they provide equivalent or greater access than would compliance with federal architectural standards, there is no comparable license to substitute requests for personal assistance for the architectural standards required for new construction after 1991.

In support of his reading of the equivalent facilitation provision, the Sherriff points to section 35.150 (b)(1) of the ADA, which states that "[a] public entity may comply with the requirements of this section through such means as . . . acquisition of equipment . . . ***assignment of aides to beneficiaries*** . . . [a] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section." 28 C.F.R. § 35.150 (b)(1). But that provision applies to ***existing facilities*** that were built before 1992, and was drafted in order to reduce the need for existing facilities to engage in costly renovations. *Id.* Cermak was built in 1998, however, making the defendant's reliance on the language of 35.150 (b)(1) untenable. The omission of similar language in § 35.151—the provision that does apply to post-1991 facilities like Cermak— is telling; as it indicates that the drafters likely did not intend the existing facilities equivalent facilitation provision to encompass "the assignment of aids or beneficiaries." *See* 28 C.F.R. § 35.151(c)(1).

There is scant case law interpreting these regulations, but the distinction between architectural and operational accommodations is consistent with the reading the Supreme Court gave to the Title II implementing regulations in *Tennessee v. Lane*, 541 U.S. 509 (2004). There, in considering the question of whether Congress had the power to abrogate state sovereign immunity in the context of a suit seeking equal access to the courts under Title II of the ADA, the Court contrasted the requirement for post-1991 construction to satisfy prescribed architectural standards with the flexibility to adopt procedural modifications with respect to older facilities. As the Court pointed out, "[i]n the case of facilities built or altered after 1992, the [Title II] regulations require compliance with specific architectural accessibility standards," while in the case of existing facilities public entities "may comply with Title II by adopting a variety of less costly measures, including . . . assigning aides to assist persons with disabilities in accessing services." *Id*. at 532. While this was not the specific question before the Court in *Lane*, the Court's observation was not gratuitous; Lane, who was one of the state court plaintiffs and was wheel-chair bound and could not access a second floor courthouse in a building that lacked an elevator, complained that the state was in violation of the ADA notwithstanding its offer to have him carried up the stairs by court personnel. *Id*. at 513 (Lane "refused . . . to be carried by officers to the courtroom"). *See also Antoninetti v. Chipotle Mexican Grill, Inc.,* 643 F.3d 1165, 1174 (9th Cir. 2010) (Ninth Circuit noting that "[t]he substitutes that Chipotle provided…do not constitute 'equivalent facilitation' because they do not involve 'use of other designs and technologies'"); *Moeller v. Taco Bell Corp*. 816 F. Supp. 2d 831, 864 (N.D. Cal. 2011) (finding that the availability of staff assistance to retrieve out-of-reach items for patrons was inconsistent with the plain language with the equivalent access provision because the staff were not alternative "designs or technologies.")

Although the ADA does not provide detailed examples of what would be an appropriate new design or technology for toilets and showers in a jail cell, the guidelines do include examples of permissible alternatives to the ADA structural requirements for other areas. *See Americans With Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities*, 56 FR 35408-01, Comment 2.2. These examples further support a reading of the equivalent facilitation provision as only applying to new designs or technologies. For example, in the case of alterations to an existing facility, the guidelines permit an elevator car to have different dimensions when usability can be demonstrated and all other elements required to be accessible comply with the applicable provisions. *Id.* The guidelines also permit the use of a portable text telephone if it is readily available for use with a nearby public pay telephone that is equipped with a shelf; an electrical outlet within, or adjacent to, the telephone enclosure; and a long enough telephone handset cord to allow connection of the text telephone and the telephone receiver if an acoustic coupler is used. *Id.* The guidelines additionally note that teller counters in stores, banks, and hotels that lack an ADA compliant counter are permitted to have a folding shelf attached to the main counter that allows a disabled person to write and handle materials that are exchanged back and forth. *Id.* But conspicuously absent from any of the five specific provisions provided by the rule makers is any mention of an entity providing a "service" that would be an appropriate accommodation. Instead, all of the provided examples focus on varying structural designs as alternatives to the structural designs provided by the ADA.

A final point supports Clemons' argument. Title II of the ADA requires affirmative, proactive accommodations necessary to ensure meaningful access to public services and programs, not accommodation upon request. *See* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications"); *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d

1185, 1197 (10th Cir. 2007) (court noting that an individual's failure to expressly request an accommodation is not fatal to a Title II ADA claim); *Phipps v. Sheriff of Cook County*, 681 F. Supp. 2d 899, 926 (N.D. Ill. 2009) (court indicating that Title II of the ADA embodies no requirement for the plaintiff to request accommodation). Thus, in arguing that assistance was available to Clemons whenever he asked for it, the Sheriff gets things backward: Cermak was required to provide non-discriminatory access; Clemons was not required to request it. The Sheriff's broad reading of the equivalent facilitation provision would render it superfluous, as public entities could simply avoid the ADA structural standards in favor of providing an aid or beneficiary, and then avoid affirmative compliance altogether by awaiting requests for individual assistance. *See, e.g., California Found. for Indep. Living Centers v. County of Sacramento*, No. 2:12-CV-03056, 2015 WL 6744659, at *14 (E.D. Cal. Nov. 4, 2015) (court declining to find that airport provided "equivalent facilitation" with gate agents who could walk around non-compliant counters to approach disabled patrons because "then almost any counter arrangement could pass muster.").

Because the scope of the ADA equivalent facilitation provision is limited to the use of "designs, products, or technologies," the accommodations provided by the defendants fall outside the provision's purview. But even if the Court were to consider nursing services as an alternative design or technology, it cannot be said that those services provide "equivalent access" to Cermak's programs and services. To permissibly deviate from the ADA's structural requirements, the alternative must provide equivalent or greater access than would full compliance with the ADA's structural requirements. *See* 28 C.F.R. § 35.151 (c)(1). The inadequacy of the defendants "equivalent" facilitation is highlighted by the fact that Clemons was injured as he transferred from his wheelchair to the makeshift shower chair provided by the

defendants. And by requiring Clemons to rely on nursing assistance, rather than providing the means for Clemons to address his own basic needs, the defendants are not providing "equivalent access," as the purpose of the ADA, even in the jail context, is to promote the ability of individuals with disabilities to engage in "independent living." 42 U.S.C. § 12101(a)(7). Thus, it cannot be said that the defendants provided Clemons with equivalent access to prison programs or services.

Because Cermak cells 3151 and 3225 did not comply with the ADA's structural requirements, and the Sheriff's Department has failed to show that Clemons was provided equivalent access, there can be no dispute that the defendants failed to comply with Article II of the ADA and therefore denied Clemons with access to programs and services. *See Lane*, 541 U.S. at 531 (*citing* 42 U.S.C. § 12131 (2)); *see also* 28 C.F.R. § 35. 149.[6]

### B. Intentional Discrimination

Next, to prevail on his summary judgment motion for his ADA claims, Clemons must establish that the Sheriff intentionally discriminated against him because of his disability. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). As is the case with other Circuits, the Seventh Circuit has not determined the appropriate standard for determining intentional discrimination in Title II cases. *See Id.* Five Circuits have "rejected discriminatory animus and held that deliberate indifference satisfies the requisite showing of intentional

---

[6] Were the Court to conclude that providing assistance could substitute for compliance with required design standards, fact issues as to the availability and adequacy of the nursing assistance provided by the Sheriff to compensate for the non-compliant features of Clemons' cells would preclude summary judgment. Clemons claims, for example, that he was not provided the necessary assistance in emptying and cleaning his colostomy bag and catheter, PSAF ¶ 6, and that he was only allowed to shower once during the course of his stay in Room 3115. PSAF ¶ 9. Additionally, while residing in Room 3225, Clemons claims that the group shower room was the only place he could properly wash his hands and that it was available during limited hours. PSAF ¶ 14. The Sheriff disputes these assertions. DSOF ¶¶ 13, 35, 41.

discrimination." *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262 (3d Cir. 2013); *see also Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012) (finding deliberate indifference is appropriate standard for showing intentional discrimination); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (same); *Barber ex rel. Barber v. Colorado Dept. of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (same); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001) (same). The alternative standard would require that a plaintiff show that the defendant acted with discriminatory animus, rather than simply indifference to the plaintiff's disability. But the Sheriff does not advocate for such a standard, and both parties agree that if Clemons can show that the Sheriff acted with "deliberate indifference" then he has satisfied the requisite intent.

In applying the deliberate indifference standard to ADA cases, courts have held that deliberate indifference "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001); *see also Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014) (applying similar recitation of the deliberate indifference standard to inmate's Eighth Amendment claim). This standard does not require a showing of "ill will or animosity toward the disabled person"; deliberate indifference to a strong likelihood that a person's federally protected rights will be violated suffices. *Meagley*, 639 F.3d at 389; *Loeffler v. Staten Island U. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009). The defendants argue that they had no knowledge of Clemons' accessibility issues because "[g]iven Cermak's twenty-four a day, seven days a week medical care, it is impossible that Defendant Dart would have foreseen a strong likelihood Plaintiff would not be able to participate in an activity, like showering, based on his disability." Defs.' Mot. for Summ. J. 14-15, ECF No. 82. This is particularly so, he urges, because Clemons made no request

for accommodation. *Id.* at 16. In applying the two-part deliberated indifference test to the record before the court, however, it is apparent that in assigning Clemons to non-ADA compliant cells, the defendants engaged in exactly the sort of "thoughtlessness and indifference" that the ADA was enacted to prevent. *See Choate*, 469 U.S. at 295.

As to the first prong of the deliberate indifference analysis—knowledge that harm was likely—it could hardly have been more apparent that Clemons, who spends his every waking moment confined to a wheelchair, was in need of ADA compliant facilities. The Sheriff maintains that because Clemons could request assistance at any time, there was no basis to foresee that he could be harmed by the non-compliant aspects of his cells, but that argument rests on the same rejected premise that providing assistance upon request satisfied the Sheriff's duty under the ADA; the Sheriff cannot prevail by pointing to legally insufficient compliance measures as a reason that harm resulting from non-compliance was not foreseeable. The Sheriff also argues that Clemons was not harmed by the fact that some of the fixtures in question were not ADA-compliant; most notably, for example, a compliant toilet—one at the required height and equipped with grab bars—would not have been of any help to Clemons, who would have been unable to use such a fixture in its normal fashion because he uses a colostomy bag and a catheter to eliminate waste from his body. Similarly, while it is undisputed that Room 3115 contained a fixed chair that prevented Clemons from accessing a writing surface, it is undisputed that Clemons was bedridden for most of his stay in Room 3115; the Sheriff maintains that Clemons would therefore have been unable to use even an ADA compliant desk. And with respect to the "boats"—the temporary beds—that Clemons said limited his access to the shower room, the Sheriff argues that the failure to have them removed would, at best, amount to an

isolated act of negligence. *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 930 (7th Cir. 2004) (isolated acts of negligence are not actionable under the ADA).

But other aspects of the cells' non-compliance did affect Clemons, such as his inability to reach the sink in cell 3225, because it was located directly behind the toilet, and his inability to shower on his own. And if it was not immediately apparent that Clemons needed an ADA compliant cell, this need should have become readily apparent once Clemons fell and injured himself while attempting to transfer from his wheelchair to the non-ADA compliant shower chair. And even though Clemons could not use the toilet and sink in a traditional fashion, he still needed to use it to empty his colostomy bag and to wash his hands afterwards but could not do so.

Further, that "[t]here is no evidence that Plaintiff requested a reasonable accommodation," as the Sheriff argues, is beside the point. Defs.' Mot. for Summ. J. 16, ECF 82. As discussed above, Clemons did not need to file a formal request for accommodation to trigger the ADA's protections, as Title II of the ADA "embodies no such requirement." *Phipps.*, 681 F. Supp. 2d at 926. True, the regulations concerning Title I of the ADA require an employer and employee to engage in an "interactive process" that often requires the employee to make a request for accommodation. *Beck v. Univ. of Wisconsin Bd. of* Regents, 75 F.3d 1130, 1134 (7th Cir. 1996). But Clemons' claim is governed by Title II of the ADA, which contains no "interactive process" requirement. *See* 42 U.S.C. § 12132. With respect to facilities constructed after 1991, such as Cermak, Title II imposes an affirmative obligation on public entities to provide facilities (here, the provision of fixtures necessary for personal hygiene) that comply with detailed architectural standards or provide equivalent access. *See* 28 C.F.R. § 35.151. As discussed above, the defendants failed to provide ADA compliant facilities to Clemons during

the entire duration of his stay at Cermak. Thus, even though some of the non-ADA compliant features at first blush may have seemed unnecessary, because Clemons did in fact suffer an injury while using the non-ADA compliant shower, any reasonable juror could only conclude that the Sheriff's Department was aware that Clemons needed ADA compliant accommodation.

As to the second prong of the deliberate indifference analysis, the record supports only a finding that the defendants failed to prevent Clemons' federal statutory rights from being violated. Once a plaintiff has shown that the defendant had knowledge that "harm to a federally protected right is substantially likely," he must show that the defendant "fail[ed] to act upon that likelihood." *Duvall*, 260 F.3d at 1139. Here, it is apparent that at the time Clemons was housed at Cermak there were some ADA compliant cells but, for whatever reason, Clemons was not placed in any of those cells.[7] Rather than dispute this point, the Sheriff attempts to shift responsibility for this misstep onto the county medical personnel. Defs.' Mot. Summ. J. 8, ECF No. 82. The Sheriff argues that his correctional officers were not responsible for assigning Clemons, or any inmate for that matter, to a particular room at Cermak. *Id.* Thus, there is no way **they** could have acted with deliberate indifference. *Id.*

In support of his attempt to divorce himself from the conduct of the Cermak facilities' correctional officers, the Sheriff points to a line of cases that indicate that Cermak is operated by Cook County, which is responsible for all medical care provided in the facility. *Everett v. Cook County*, 655 F.3d 723, 725 (7th Cir. 2011); *Harrison v. County of Cook*, No. 08 C 3202, 2011 WL 4036115, at *8 (N.D. Ill. Sept. 12, 2011) (court finding that Cook County Sheriff was not responsible for Cermak medical personnel's decision to forego treating plaintiff inmate's

---

[7] To the extent that the Sheriff argues that his inability to assign Clemons to a compliant cell is a result of overcrowding, and therefore does not reflect deliberate indifference to Clemons' need for ADA accommodation, he has failed to adduce any evidence to support the contention that there was no ADA cell available when Clemons' assignment was made.

medical ailments because the Sheriff is not responsible for providing medical care). But those cases are inapposite here. Clemons' claims relate to his cell assignment and not the provision of inadequate medical treatment, as was the case in each of the cases cited by the Sheriff. Indeed, the Sheriff's own brief acknowledges that Clemons' complaints regarding his detention at Cermak "relate only to his housing assignment"; this case has nothing to do with the adequacy of the medical care Clemons received at the Jail.

Sheriff Dart's position that responsibility for Clemons' housing assignments at Cermak was entirely within the discretion of Cook County medical personnel, moreover, is simply not supported by the record. The defendants point to the first sentence of the Cook CHHS infirmary operational statement which states that "[o]n the 3rd floor medical unit, an RN or LPN reviews the admission orders and assigns a bed." DSOF ¶ 1. But in the very next sentence the policy states that "[t]he nurse ***must confer with Correctional Officers*** to incorporate both clinical and security considerations when assigning a bed." *Id.* Thus, it is apparent that even though CCHHS medical personnel had some say in where prisoners were housed, Sherriff Department employees did too. Further undermining the defendants' claim is the defendants' admission during discovery that Correctional Officers assigned Clemons to the non-ADA compliant rooms. PSOF ¶ 28. Thus, there can be no dispute that the Sheriff's personnel had some role in assigning Clemons to a non-ADA complaint cell and failed to act in a manner that prevented Clemons' federally protected rights from being violated.[8]

Given Clemons' obvious need for an ADA compliant cell and the presence of those cells within the Cermak facility, a reasonable juror could only find that the defendants acted with deliberate indifference and "fail[ed] to act" upon the likelihood that Clemons' would be denied

---

[8] There is no evidence of record that any correctional officer objected in any way to Clemons' assignment to non-compliant cells.

the access to the needed "programs and services." That the Sheriff and the County have devoted substantial resources to improving their compliance with ADA requirements, as the Sheriff's brief in support of his motion details, is commendable but it does not provide immunity for the failure to provide reasonable accommodations with respect to Clemons' housing assignment. Accordingly, Clemons' motion for summary judgment on his ADA and rehabilitation act claims is granted, and the Sheriff's cross motion for summary judgment on those same claims is denied.

## II. Clemons' 1983 Claim

The defendants also move for summary judgment on Clemons' 1983 claim against the Sheriff, which is predicated on a *Monell* theory of liability. Under *Monell*, a local governmental entity is liable for damages only if a plaintiff can show that the alleged constitutional violation occurred as a result of an official policy, custom, or practice. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978). "The 'official policy' requirement for liability under § 1983 is to 'distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 515 (7th Cir.2007) (*quoting Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). A municipality can be said to have violated the rights of a person because of its policy in one of three ways: "(1) an express policy that, when enforced, causes a constitutional deprivation, (2) a wide-spread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008); *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir. 1994).

The Sheriff asserts that Clemons's *Monell* claim fails as a matter of law because Clemons' allegations fail to provide sufficient evidence of a widespread custom or practice that deprived him of ADA compliant housing. Clemons contends that the Sheriff had a policy of "housing disabled detainees like plaintiff in accessible housing units" which resulted in a violation of his Fourteenth Amendment rights. Pl.'s Resp. to Defs.' Mot. for Summ. J. 12, ECF 92. Because Clemons does not allege that the Sheriff had an explicit policy that resulted in the assignment of inmates to inaccessible cells, his argument rests on a finding that there was an implicit policy resulting in a "wide-spread practice, that . . . is so permanent and well settled as to constitute a custom or usage with the force of law." *Klebanowski*, 540 F.3d at 637.

Clemons' argument falls well short. Where the alleged constitutional deprivation resulted from an implicit policy, a plaintiff must present evidence of a widespread practice, not simply an isolated event. *Grievson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). In *Grievson*, the Seventh Circuit affirmed the district court's grant of summary judgment on the plaintiff prisoner's *Monell* claim because he had failed to provide sufficient evidence of a widespread custom or practice that caused the alleged constitutional violation. *Id.* at 774-75. The plaintiff had alleged that the jail's practice of providing inmates with an entire bottle of medication, rather than just a single dose, made him susceptible to attack from other inmates. *Id.* at 773. But the plaintiff had failed to present any evidence relating to other inmates, with the exception of a general statement that indicated all prisoners received their medication in the same manner. But this general statement did not indicate the frequency of the practice, the court reasoned, as the plaintiff did not indicate the number of inmates involved or the number of disbursements the plaintiff witnessed. *Id.* at 774.

Similarly here, Clemons' *Monell* claim fails because his allegations pertain exclusively to his own experience at Cermak. Clemons contends that by assigning him to inaccessible cells the defendants subjected him to cruel and unusual punishment and violated his constitutional rights via the Fourteenth Amendment. But even accepting this allegation as true, much like the plaintiff in *Grievson*, Clemons fail to provide any particular evidence that this was a widespread practice or policy because although he maintains that he was assigned to an inaccessible cell by correctional officers, he has failed to provide specific evidence that other inmates were routinely subjected to the same treatment. Certainly the fact that some other law suits by disabled inmates had been filed does not, by itself, establish the existence of such a policy, but Clemons points to nothing else. He provides no evidence of the number of disabled inmates at Cermak specifically, or at the Jail, generally. Nor does he supply data about the availability and occupancy of ADA compliant cells at any point in time, much less over a period from which it might be inferred that the Sheriff had a policy of assigning inmates to non-compliant cells (indeed, to the extent that ADA compliant cells were fully occupied, that fact would tend to undermine an argument that the Sheriff's policy was ***not*** to assign disabled prisoners to the ADA compliant cells).

Instead, Clemons asserts that "[d]efendant does not point to facts showing that there was no such policy." Pl.'s Resp. to Defs.' Summ. J. Mot. 12, ECF No. 92. In making that argument, however, Clemons improperly attempts to shift the burden of proof to the Sheriff. But with respect to the defendants' summary judgment motion, the Sheriff has no burden to disprove Clemons' claims; rather, he need only show that Clemons has failed to offer any facts that could lead a reasonable juror to find in his favor. By highlighting Clemons' failure to offer any facts supporting his allegation that the defendants had a discriminatory policy—whether explicit or

implicit—the defendants have done just that. Accordingly, defendants' summary judgment motion with respect to Clemons' 1983 claim is granted.

***

In conclusion, Clemons' motion for summary judgment on his ADA and Rehabilitation Act claims is granted. The defendants' summary judgment motion with respect to those claims is denied. But their motion for summary judgment on Clemons' 1983 claim is granted, as Clemons has failed to provide sufficient evidence of a widespread custom or practice that caused his alleged constitutional violation.

Date: March 9, 2016

                                                      _____
                                                    John J. Tharp, Jr.
                                                    United States District Judge